The UNITED STATES of America,
Plaintiff–Appellee,

v.

Dennis L. MARTIN,
Defendant–Appellant.

No. 90–5411.

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 5, 1990.

Decided Dec. 4, 1990.

Rehearing and Rehearing En Banc
Denied Jan. 23, 1991.

394

John W. Gill, Jr., U.S. Atty., Michael
Winck (argued), and James R. Dedrick,
Asst. U.S. Attys., Office of U.S. Atty.,
Knoxville, Tenn., for plaintiff-appellee.

Herbert S. Moncier (argued), Knoxville,
Tenn., for defendant-appellant.

Before GUY and BOGGS, Circuit Judges, and BERTELSMAN, District Judge.*

RALPH B. GUY, Jr., Circuit Judge.

Defendant, Dennis Martin, appeals from his jury trial conviction on one count of distributing cocaine, 21 U.S.C. § 841(a)(1). On appeal, Martin argues that: (1) the district judge improperly restricted his cross-examination of the government's key witness, (2) it was error to allow the jury to have two different transcripts of the same tape recording, (3) the FBI case agent should have been sequestered prior to testifying, (4) the government's key witness should not have been allowed to testify about and explain events that occurred during a tape recorded conversation between the witness and the defendant, and (5) the search warrant for defendant's home was defective and evidence seized should have been suppressed.

Upon a review of the record we find no errors requiring reversal and affirm.

I.

On May 24, 1989, Floyd Graham, working as a paid informant for the FBI, bought an ounce of cocaine from the defendant. Graham was wearing a body recorder at the time of the purchase. On June 1, 1989, a similar purchase was made by Graham from the defendant. Although Graham was again wearing a recorder, this second transaction was not recorded due to a malfunction. Martin was subsequently indicted and charged with the two cocaine sales as well as using a telephone to facilitate the distribution of the cocaine involved in the June 1, 1989, sale. Martin was only found guilty of the May 24, 1989, sale.

II.

The Cross–Examination Issue

 The trial in this case was relatively short and revolved entirely around whether the jury believed Graham. Accordingly, the entire defense was built around destroying Graham's credibility. From defense counsel's opening statement to the closing argument, the entire focus was a relentless attack directed against Graham. All of the witnesses called by the defendant, which included Graham's wife, his mother-in-law, and his sister-in-law, were called for the express purpose of attempting to convince the jury that Graham was a person not worthy of belief. Even before the defendant's opening statement, the government, in anticipation of the defense, had alerted the jury to the fact that Graham was an unsavory character. On Graham's direct examination, the government brought out at some length Graham's background and his relationship with the government agents.

Among other things which the defense brought out relative to Graham was his use of narcotics for a number of years, his prior criminal history, his jealousy of the defendant whom he accused of having an affair with his wife, his poor reputation for honesty, the fact that he may have mental problems, the fact that he was on probation and facing other serious criminal charges at the time he sought out the FBI and offered his services, and the fact that he was getting room and board money from the FBI as well as certain lump-sum cost payments.

The primary areas of questioning in which the government's objections were sustained and the court limited cross-examination concerned arrests of Graham which did not result in convictions and matters that went so far back in time that the court found them to be of dubious relevancy.

It is clear that "trial judges retain wide latitude" in imposing "limits on ... cross-examination...." *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986). Obviously a defendant cannot complain about correct evidentiary rulings even if they have the effect of limiting cross-examination, and we believe that covers the vast majority of

---

* The Honorable William O. Bertelsman, United States District Court for the Eastern District of Kentucky, sitting by designation.

the rulings made by the trial judge here. Even in cases where an improper evidentiary ruling limits cross-examination, the test is "whether the jury had enough information, despite the limits placed on otherwise permitted cross-examination, to assess the defense theory." *Dorsey v. Parke,* 872 F.2d 163, 167 (6th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 103, 107 L.Ed.2d 67 (1989). There can be little doubt here that the jury was virtually inundated with negative information relating to Graham and his credibility. As a result, they acquitted Martin on all counts based on Graham's testimony which was not otherwise corroborated.

As the Supreme Court stated in *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985), "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (Emphasis in original).

### III.

The Transcript Issue

██ The May 24, 1989, conversation between Graham and the defendant was the only one that was successfully recorded. During pretrial proceedings, Martin and his counsel were given a copy of the recorded conversation as well as a transcript of the recording prepared by the government. It was made clear to the defendant that this was only a preliminary transcript. Martin had no objection to the transcript. Shortly before trial, the government produced an expanded transcript which filled in some of the "inaudible" blanks that were contained in the first transcript. The defendant objected and the government and the defense could not agree on a version to be submitted to the jury.

The trial judge resolved the issue by submitting both transcripts to the jury and allowed the tape to be played twice so the jury could compare the transcripts, one at a time, to the tape as it was being played. The jury was told on several occasions that it was the tape and not the transcripts which was the evidence on which they must rely.

In *United States v. Robinson,* 707 F.2d 872 (6th Cir.1983), we set forth guidelines for the use of transcripts where recordings were being played for the jury. Adopting the analysis of the District of Columbia Circuit in *United States v. Slade,*[1] we set forth three procedures for dealing with transcripts. The preferred procedure is to have the parties stipulate to a transcript. Failing to get a stipulation, it is next recommended that the trial judge make a pretrial determination of accuracy. The least preferred method is to present two transcripts to the jury, one of which contains the government's version and the other the defendant's version.[2] Although the least preferred method was the one used here, we find no error for a number of reasons.

To begin with, and perhaps most obvious, by denominating the "two transcript" approach as the least preferred, we did not hold that it was error to proceed in this manner. Second, as to substantial portions of the two transcripts, the difference was negligible. Finally, the conversation was between a witness who testified, and was subject to cross-examination, and the defendant. Thus, the defendant was capable of ascertaining the accuracy of his own statements as represented in the transcript, and was present and heard the other end of the conversation which was directed at him.

We emphasize that the use of transcripts is a matter committed to the sound discretion of the trial judge and we reverse only for an abuse of discretion. *United States v. Onori,* 535 F.2d 938, 947 (5th Cir.1976). We find no abuse of discretion here.

### IV.

The Sequestration Issue

██ Martin argues that by allowing the FBI case agent, Clyde Merryman, to re-

1. *United States v. Slade,* 627 F.2d 293 (D.C.Cir.), *cert. denied,* 449 U.S. 1034, 101 S.Ct. 608, 66 L.Ed.2d 495 (1980).

2. Defendant objects to the first transcript produced being characterized as "his version." Although it is true that the defendant offered no transcript of his own, he did not object to the first transcript prepared by the government.

main in the courtroom while other government witnesses testified, Merryman was able to fill in and explain any gaps in the earlier witnesses' testimony. Thus, Martin contends that if Merryman was allowed to remain, he should have been compelled to be the government's first witness. We disagree.

Even before the Federal Rules of Evidence were adopted, the law in this circuit was settled that the case agent may remain in the courtroom even when other witnesses were being sequestered. *United States v. Wells,* 437 F.2d 1144 (6th Cir.1971). Federal Rule of Evidence 615, which deals with the exclusion of witnesses, provides that the court may not exclude "an officer or employee of a party which is not a natural person designated as its representative by its attorney...." The comments to the rules have made clear from the beginning that case agents are intended to be included within this exception. Although we can conceive of a situation in which it would be within the discretion of the trial judge to require a non-sequestered witness to testify first, it is difficult to conceive of a situation in which the *failure* to do so would be reversible error. The case agent is the prosecutor's information source and even if the agent were excluded, the prosecutor would still have to reveal to him what other witnesses had said and done in order to map out strategy. This would defeat the whole purpose of sequestration. Also, the case agent is frequently not the most important or knowledgeable government witness and to require him to testify first may well make no sense at all.

The trial court acted consistent with the mandate of Fed.R.Evid. 615 in refusing to order the sequestration of the case agent.

## V.

### Graham's Testimony Relative to the Taped Conversation

After the jury heard the tape of the May 24, 1989, conversation between Graham and Martin, Graham was asked certain questions about the transaction that was the subject of the conversation. Martin claims that Graham was improperly asked about some of Graham's statements which were heard on the tape. Apparently attempting to invoke some kind of aural best evidence rule, Martin argues that the tape speaks for itself. The government counters by citing our decision in *United States v. Graham,* 856 F.2d 756, 759 (6th Cir. 1988), *cert. denied,* 489 U.S. 1022, 109 S.Ct. 1144, 103 L.Ed.2d 204 (1989), which held that "[a] government agent may, like any other witness, testify in the form of an opinion as to his understanding of a defendant's statement." Both contentions somewhat miss the mark.

First, the conversation on the tape was between the defendant and a testifying witness and was introduced while the witness was on direct examination. Under such circumstances the witness, if the prosecutor asks, is free to first describe the conversation in his own words and indicate what was said and what occurred. The tape may then be played as corroboration. If the tape is played first, however, it does not mean that a party to that conversation is thereby prohibited from testifying relative to the event.[3]

Furthermore, the opinion testimony we are dealing with here is not the same as the testimony at issue in *Graham.* In *Graham,* an FBI agent was permitted to testify that when in an undercover capacity he was asked to make a campaign contribution, what was really intended was a bribe. Graham was not asked here to characterize Martin's words in a manner different than their apparent plain meaning. Rather he was asked what was meant by phrases that would have been clear *in context* to the person hearing them, but may not be clear to one merely hearing the words. For example, when Martin said on the tape,

---

**3.** Fed.R.Evid. 1002 is not relevant to this situation. The rule reads: "To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by Act of Congress." The intention here is not to prove the content of a recording but rather to corroborate a conversation which the government claims to have occurred.

"Please count out ten of them things," it would not necessarily be clear to the jury that Graham was holding a handfull of $100 bills when the statement was made unless Graham explains. There is no rule of evidence that prohibits such an explanation. This is not opinion testimony.

We find no error in Graham's elaboration on the events that were occurring during the conversation that was taped and played for the jury.

## VI.

### The Search Warrant

Contemporaneous with the arrest of the defendant on the indictment, a search warrant was executed at his home. The only item admitted into evidence as a result of that search was a roll of money amounting to $2,900 held together by a yellow rubberband. The yellow rubberband was similar to those used to wrap the one-ounce packages of cocaine which Graham had purchased and which were introduced into evidence. Prior to trial, Martin had filed a motion to suppress, and certain items seized were suppressed as being irrelevant.[4]

Although the items seized do not appear to be very incriminating, the defendant nonetheless argues that they should have been suppressed because the affidavit on the basis of which the search warrant was issued was defective, was overly general, and did not provide probable cause for the issuance of a warrant.

▇ Defendant's argument that the affidavit was defective is predicated on what defendant perceives as certain omissions from the affidavit of agent Merryman. Specifically, defendant contends that the agent never told the magistrate that his principal informant (Graham) was a person whose veracity was open to serious question.[5] There are several problems with this argument.

First, the affidavit recited that the information the confidential informant had provided in this case had been verified and indeed had resulted in two purchases of cocaine from the defendant. The fact that the informant may have been of general bad character is really not relevant under the circumstances here where the information provided by the informant has already lead to the indictment of the defendant.

Second, there is no allegation that false information was contained in the affidavit. As was stated in *United States v. Colkley*, 899 F.2d 297, 301 (4th Cir.1990):

> While omissions may not be *per se* immune from inquiry, the affirmative inclusion of false information in an affidavit is more likely to present a question of impermissible official conduct than a failure to include a matter that might be construed as exculpatory. This latter situation potentially opens officers to endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit. The potential for endless rounds of *Franks* hearings to contest facially sufficient warrants is readily apparent.

(Citations omitted).

Third, it is often people involved in criminal activities themselves that have the most

---

4. The items suppressed were a bullet-proof vest, an RV detector, and a catalogue entitled "Audio–Intelligence Devices."

5. We find no merit to defendant's contention that he was entitled to a hearing on this issue. *Franks v. Delaware*, 438 U.S. 154, 171, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978). The *Franks* court stated:
 To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations

must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant.

knowledge about other criminal activities. As the Ninth Circuit observed:

> It would have to be a very naive magistrate who would suppose that a confidential informant would drop in off the street with such detailed evidence and not have an ulterior motive. The magistrate would naturally have assumed that the informant was not a disinterested citizen. While the magistrate was not informed of the informant's probity, the magistrate was given reason to think the informant knew a good deal about what was going on at [the residence].

*United States v. Strifler,* 851 F.2d 1197, 1201 (9th Cir.1988), *cert. denied,* 489 U.S. 1032, 109 S.Ct. 1170, 103 L.Ed.2d 228 (1989).

■ Martin's contention that there was no reason to search the defendant's house is equally without merit.[6] Agent Merryman stated in his affidavit that in his experience a person engaged in the distribution of cocaine frequently keeps at his residence a number of different items, which items were then set forth in detail in the affidavit. Martin makes no attack on agent Merryman's experience or his conclusions relative to what cocaine dealers keep around. Although it is true that this list of items is exhaustive, this is because the investigative agencies have learned through experience that the courts (not to mention the Constitution) are going to require them to be very specific. The items listed in the search warrant here are similar to those we see listed in most search warrant affidavits seeking evidence related to narcotic offenses.[7]

A search of the residence was further justified by the fact that one of the narcotics sales took place very near the residence and the confidential informant had been inside the residence and provided some information as to what was kept there.

We can find no defects in the warrant nor in the affidavit on which it was based.

AFFIRMED.

---

6. We note in passing that, since the officers also had an arrest warrant, a limited search of the house would have been authorized even without a search warrant.

7. Ongoing narcotics distribution operations typically generate a broad range of items which have evidentiary significance. To name a few— chemicals, money, firearms, records, ledgers, beepers, scales, telephone numbers, a variety of common household items and related narcotic paraphernalia. In contrast, the evidence from a single armed bank robbery might be no more inclusive than a firearm and the money taken.