**UNITED STATES of America, Plaintiff,**

v.

**Samuel Allen YATES, Defendant.**

**No. 99–CR–20073–BC.**

United States District Court, E.D. Michigan, Southern Division.

Feb. 8, 2001.

Richard L. Lee, Jr., Mathieu & Lee, Midland, MI, for defendant.

## *MEMORANDUM OPINION AND OR- DER DENYING DEFENDANT'S MOTION TO SUPPRESS EVI- DENCE*

LAWSON, District Judge.

This matter is before the Court on the motion by defendant, Samuel Allen Yates,

to suppress evidence seized by the government during the execution of a search warrant at his home, and a search of the defendant's person during a brief stop and detention, all of which occurred on June 22, 1999. The defendant contends that the search warrant affidavit was defective because it did not establish probable cause to search, the search warrant itself did not describe the items to be seized with sufficient particularity, the officers executing the search warrant seized items which were not included in the warrant, and the stop and detention of the defendant's own person was unlawful. Because the Court finds that there was no defect in the affidavit or search warrant, or in the manner in which it was executed, and because the stop and detention of the defendant did not violate the Fourth Amendment, the Court will deny the defendant's Motion to Suppress Evidence.

## I.

The defendant is charged in a second superseding indictment with conspiracy to distribute marijuana, interstate travel and the distribution of marijuana, and failure to appear when released on bond, in violation of 21 U.S.C. §§ 846, 841(a)(1) and 18 U.S.C. §§ 1952 and 3146(a)(1). The first two charges arose from an investigation conducted by agents of the United States Drug Enforcement Administration (DEA) in Saginaw, Michigan which initially led to the arrest of Clarence "Stormy" Wagner and David Jurisch after they sold marijuana to an undercover officer. Wagner and Jurisch pleaded guilty to marijuana trafficking charges and agreed to cooperate with the government and identify the source of the marijuana which they sold.

Jurisch and Wagner informed DEA Agent T.J. Stevens that they had traveled from Missouri to Arizona with the defendant, Samuel Allen Yates, to obtain marijuana on several occasions. The information which Stevens and others obtained from Wagner and Jurisch was summarized in an affidavit which was presented to United States Magistrate Judge William A. Knox in Missouri on June 17, 1999 in support of an application for a warrant to search Yates' home. The affidavit states in pertinent part:

5. DEA–1 told S/A McGovern that between November 20 and November 24, 1998, Stormy Wagner, Dave LNU [last name unknown], Sam LNU, and DEA–1 made a trip to Arizona. Wagner purchased sixty (60) pounds of marijuana using money supplied by Wagner, Dave and Sam. The four then drove to St. Louis, Missouri. Sam LNU separated from the group, taking a portion of the marijuana with him. The rest continued on to Michigan.

. . .

17. Wagner volunteered that the telephone number used by him at his rented residence, located at 903 Wilson, Bay City, Michigan is (517) 895–7108. Jurisch volunteered that the telephone number used by him at his residence, located at 4145 South Fraser, Bay City, Michigan is (517) 684–9885. Both Wagner and Jurisch have identified a photograph of Sam Yates of 18172 Deer Drive, Rocky Mount, Morgan County, Missouri, near the City of Eldon, Missouri, in separately conducted photo line-ups as being the Sam LNU who traveled with them from Missouri to Arizona to obtain marijuana on various occasions, most recently in November of 1998. Wagner acknowledged making one such additional trip with Yates and Jurisch in July of 1998 to obtain 20 pounds of marijuana. Yates was the "middle man" in that transaction between the source on the one hand and Wagner and Jurisch on the other. Wagner reported that during the trip in November of 1998, Yates obtained the marijuana from Marisol Sarmiento of 4246 West Monterey Way, Phoenix, Arizona, a different source from the person who had supplied the marijuana in July of that year. As he had on the earlier trip, Yates negotiated the purchase of the

marijuana from Sarmiento in November 1998, and then negotiated the sale of that marijuana to Wagner and Jurisch. Wagner denied knowing how much profit Yates made on the transaction, but said that Yates kept approximately one pound of marijuana out of the approximately 61 pounds acquired from Sarmiento in Phoenix in November of 1998.

18. Jurisch reported that he had made two trips to Arizona with Yates in addition to those described above. The first of the two additional trips occurred in 1997, and the second in March of 1998. On those trips, Yates and Jurisch met in Phoenix and stayed in a hotel. Yates than made a telephone call to Sarmiento, who came to their motel. Yates met privately with Sarmiento in her car, and then returned to Jurisch with the marijuana. Jurisch obtained approximately 30 to 40 pounds of marijuana from Yates on the first trip, and approximately 50 pounds on the second trip.

19. Wagner and Jurisch also reported to S/A McGovern that three to four times a year, between 1994 and 1997, Wagner would telephonically contact Yates and place an order for marijuana. Yates would arrange to have a driver deliver the marijuana to Michigan. Wagner and Jurisch would get the marijuana from the driver. Wagner also indicated that the driver apparently would deliver marijuana to the Detroit, Michigan, area for Yates. Wagner said that Yates came to Michigan to deliver 25 pounds of marijuana to him in the summer of 1994.

20. S/A McGovern, having interviewed Wagner and Jurisch separately, found their information regarding Yates to be consistent. In addition, S/A McGovern has obtained telephone toll records for telephones used by Wagner, Jurisch, Sarmiento and Yates. Those telephone toll records contain telephone calls which demonstrate the association between these four individuals, and further corroborate the information supplied by Wagner and Jurisch. Copies of the records relating to Sarmiento are attached hereto as Exhibit "A", and those relating to Yates as Exhibit "B".

20. [*sic* ] Based on my training and experience, I am aware of the habits, characteristics and practices of drug traffickers and their organizations, and have become familiar with the methods and procedures used by individuals to conduct their narcotics business, as well as the type of profits made by narcotics dealers. I am aware that drug traffickers often house and secrete records and/or documents regarding drug trafficking in their residences, outbuildings, vehicles and/or buried on their property, along with proceeds from such transactions. They maintain written records of names, telephone numbers, quantities, amounts and prices of drug transactions. Drug traffickers often place assets in names other than their own to avoid detection of these assets. Even though these assets are in other persons' names, drug traffickers continue to use these assets and exercise and control over them. Drug traffickers maintain large amounts of United States currency on-hand in order to maintain and finance their ongoing narcotics business. Drug traffickers frequently do not maintain bank accounts where they deposit their drug profits, but make extensive use of currency, since cash is very difficult to trace. Currency is usually collected and transported as controlled substances are delivered.

21. Based on the information set forth in this affidavit, I believe that SAM YATES has violated Title 21, United States Code, Sections 841(a)(1) and 846, and that probable cause exists to believe that, located on the property located at 18172 Deer Drive, Rocky Mount, Morgan County, Missouri, near the City of Eldon, Missouri, and more particularly described as a white, two-story house with blue shutters, a brown shingle roof, a carport, and a brown front door with the number "7" beside it, is evidence of

these violations. This evidence consists of, but is not limited to, the following:

A.  Any and all tax records, books, records, receipts, bank statements, and records, money drafts, letters of credit, money orders, and cashier's checks, receipts, passbooks, bank checks, lease agreements, loan records, documents and/or keys relating to safe deposit boxes and other items evidencing the obtaining, secreting, transfer, and/or concealment of assets, and the obtaining, secreting, transfer, concealment and/or expenditure of money gained through drug trafficking;

B.  Any and all papers, tickets, notes, schedules, receipts, and other items relating to intrastate, interstate and foreign travel;

C.  Any and all address and/or telephone books and papers reflecting names, addresses and/or telephone numbers;

D.  Any and all books, records, receipts, notes, ledgers, and other papers relating to the transportation, ordering, purchase, and distribution of controlled substances; and

E.  Any and all United States currency and financial instruments, including stocks and bonds which are evidence of the receipt, transfer, and secreting of assets.

Magistrate Judge Knox issued a warrant authorizing the search of the defendant's residence for evidence of drug trafficking, including financial and telephone records. The warrant did not specifically authorize a search for drugs or weapons.

Government agents planned to execute the search warrant at the defendant's residence on June 22, 1999. Before proceeding to the residence, the agents assembled in the parking lot of a convenience store, which they used as a staging area, approximately two miles from Yates' house. While at this location, the agents coincidentally observed the defendant exit the store, enter his vehicle and drive it out of the parking lot. He turned onto the adjacent road in the direction opposite to his residence.

A Missouri state trooper and DEA agents stopped the defendant's vehicle. During the stop, the defendant was informed that agents were preparing to execute the search warrant at his residence and he was asked whether he wanted to return there. The defendant advised the agents that his teen-age son was at home and he elected to return to the house with the officers. The officers patted down the defendant and $2,000 was confiscated from his coat pocket. The defendant was handcuffed and transported back to his residence. He remained there while the search warrant was executed. During the search of the home, several documents were seized as well as two .22 caliber handguns that were found in a gun cabinet.

While agents were searching his residence, the defendant asked to speak with DEA Agent David McGovern. McGovern read the defendant his *Miranda* warnings and the defendant waived his right to remain silent. Thereafter, the defendant told Agent McGovern that he was not involved in drug trafficking. However, after McGovern advised the defendant that other conspirators were in jail and cooperating with authorities, the defendant then asked if he could speak hypothetically, inquiring if there was anything "proactive" he could do to not be charged, such as buy large quantities of marijuana from a source in Arizona. He then stated that he was unwilling to do anything "proactive" for the DEA unless he could be promised he would not be charged with a crime. The conversation ended at that point.

When the agents completed their search, they removed the handcuffs from the defendant and returned the money to him that had been seized in the pat down search during the vehicle stop. The two handguns were confiscated from a gun cabinet in the house, but the agents did

not seize any of the long guns which they found there.

The defendant was indicted with four co-defendants. After the defendant filed his Motion to Suppress Evidence, the Court conducted an evidentiary hearing on December 1, 2000. The defendant testified, as did Agents McGovern and Stevens.

## II.

The defendant contends that the search warrant is invalid because the supporting affidavit does not establish probable cause to believe that records of drug transactions would be located in the defendant's house. The defendant argues that the affidavit does not contain sufficient facts to tie the drug transactions in Michigan and Arizona to his home in Missouri, and that the information about drug trafficking in 1998 was too remote in time to establish probable cause in June 1999 when the facts were presented to the United States Magistrate in Missouri.[1]

The Fourth Amendment provides that no search warrants may be issued "but upon probable cause ... particularly describing the ... things to be seized." U.S. Const. amend. IV. "Probable cause exists when there is a 'fair probability,' given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place." *United States v. Loggins,* 777 F.2d 336, 338 (6th Cir.1985) (*per curiam* ). Probable cause has been defined as reasonable grounds exist for belief which is more than mere suspicion but less than *prima facie* proof. *United States v. Smith,* 182 F.3d 473, 477 (6th Cir.1999); *United States v. One 1984 Cadillac,* 888 F.2d 1133, 1135 (6th Cir.1989). *See also Illinois v. Gates,* 462 U.S. 213, 235, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

■ In reviewing the magistrate's decision to issue a search warrant, this Court must determine "whether the magistrate had a substantial basis for finding that the affidavit established probable cause to believe that the evidence would be found at the place cited." *United States v. Davidson,* 936 F.2d 856, 859 (6th Cir.1991) (internal quotes and citation omitted). The Court should not conduct a *de novo* review of the affidavit, but rather should view it in a common-sense manner. "[T]he magistrate's probable cause determination should be afforded great deference by the reviewing court." *Id.*

■ The defendant acknowledges that the affidavit shows that he was involved in buying and selling marijuana in Arizona, and his involvement with the co-conspirators there and in Michigan. He argues, however, that the affidavit contains no facts tying that activity to his home in Missouri, and therefore there was no probable cause that evidence would be found in his house. However, the affidavit states that Wagner contacted the defendant three or four times per year between 1994 and 1997 to place orders for marijuana that the defendant would cause to be delivered in Michigan. Jurisch and Wagner stated that they regularly conducted business with the defendant located in Missouri. The telephone records show that the defendant placed calls from his residence to Jurisch and Wagner in Michigan, presumably his customers, and to Sarmiento in Arizona, presumably his source.

DEA Agent T.J. Stevens, the search warrant affiant, after reciting his experience, stated that he was "aware that drug traffickers often house and secrete records and/or documents regarding drug trafficking in their residences...." Search Warrant Affidavit, ¶ 20.

---

**1.** The defendant initially argued that two of the exhibits referenced in the search warrant affidavit—telephone records showing calls from defendant's telephone number to telephone numbers associated with Wagner and Jurisch, and also with co-defendant Sarmien-

to—were not attached when the affidavit was reviewed by the Magistrate Judge in Missouri. At the conclusion of the evidentiary hearing, the defendant withdrew that claim, inasmuch as the evidence established that the exhibits had been submitted to the Magistrate Judge.

Viewing the totality of the circumstances, it is reasonable for the Magistrate Judge to have concluded that the defendant engaged in a pattern of trafficking in marijuana, that he conducted that business from his house by making connections for the purchase and sale of the contraband, and that it was likely that he kept records of the transactions. "In the case of drug dealers, evidence is likely to be found where the dealers live." *United States v. Blair*, 214 F.3d 690, 696 (6th Cir.), *cert. denied*, —— U.S. ——, 121 S.Ct. 191, 148 L.Ed.2d 132 (2000)(quoting *United States v. Jones*, 159 F.3d 969, 975 (6th Cir.1998)). Applying a deferential standard of review using a common-sense approach, the Court finds no error in the Magistrate Judge's conclusion that there was probable cause to believe that those records would be found in defendant's home.

■ The search warrant affidavit exhibits—the telephone records—demonstrate telephone activity to and from defendant's home during June through November of 1998, which leads the defendant to argue that the illicit activity described in the affidavit is too remote to justify a finding that records of the transaction could be found in his home in June of 1999. There is merit to the argument that stale information may not support a finding of probable cause. However, "[t]he determination of probable cause is not merely an exercise in counting the days or even months between the facts relied on and the issuance of a warrant." *United States v. Williams*, 897 F.2d 1034, 1039 (10th Cir.1990), *cert. denied* 500 U.S. 937, 111 S.Ct. 2064, 114 L.Ed.2d 469 (1991). The Court of Appeals has provided guidance for assessing "vintage facts" in *United States v. Spikes*, 158 F.3d 913 (6th Cir.1998):

> [T]he question of staleness depends on the inherent nature of the crime. Instead of measuring staleness solely by counting the days on a calendar, courts must also concern themselves with the following variables: the character of the crime (chance encounter in the night or regenerating conspiracy?), the criminal (nomadic or entrenched?), the thing to be seized (perishable and easily transferrable or of enduring utility to its holder?), the place to be searched (mere criminal forum of convenience or secure operational base? ... )

*Id.* at 923 (internal quotes and citations omitted). *See also United States v. Greany*, 929 F.2d 523, 525 (9th Cir.1991) (information not stale where informant remodeled defendant's premises two years earlier to allow a second-floor marijuana grow operation); *United States v. Johnson*, 461 F.2d 285, 287 (10th Cir.1972) (when "the affidavit properly recites facts indicating activity of a protracted and continuous nature, a course of conduct, the passage of time becomes less significant.")

As reflected above, the affidavit describes an ongoing business relationship among the informants, Jurisch and Wagner, and the defendant which shows a pattern of criminal activity. The nature of the items sought—records—by their nature are designed to endure. The purpose of documents such as ledgers and accounts is to record business activity for future use, so that the information will be available at a later date. The magistrate judge did not authorize a search for marijuana which is plant material and perishable, and therefore more sensitive to the passage of time. The place to be searched was the defendant's home, suggesting that there was some permanence to the defendant's base of operation.

The Court concludes, therefore, that the information contained in the search warrant affidavit was not "stale" when evaluated by the magistrate judge in Missouri. The information, with regard to both substance and timing, established probable cause that the items sought would be located in the defendant's home.

### III.

■ The warrant issued by the Magistrate Judge in Missouri authorized the seizure of the following:

A. Any and all tax records, books, records, receipts, bank statements, and records, money drafts, letters of credit, money orders, and cashier's checks, receipts, passbooks, bank checks, lease agreements, loan records, documents and/or keys relating to safe deposit boxes and other items evidencing the obtaining, secreting, transfer, and/or concealment of assets, and the obtaining, secreting, transfer, concealment and/or expenditure of money gained through drug trafficking;

B. Any and all papers, tickets, notes, schedules, receipts, and other items relating to intrastate, interstate and foreign travel;

C. Any and all address and/or telephone books and papers reflecting names, addresses and/or telephone numbers;

D. Any and all books, records, receipts, notes, ledgers, and other papers relating to the transportation, ordering, purchase, and distribution of controlled substances; and

E. Any and all United States currency and financial instruments, including stocks and bonds which are evidence of the receipt, transfer, and secreting of assets.

Search Warrant Attachment. The defendant contends that this description is too broad and violates the general rule that "warrants shall particularly describe the things to be seized [so that] there is nothing left to the discretion of the officer." *Marron v. United States*, 275 U.S. 192, 196, 48 S.Ct. 74, 72 L.Ed. 231 (1927).

In response, the government directs the Court to *United States v. Martin*, 920 F.2d 393 (6th Cir.1990), where that court upheld a search warrant issued for the home of an individual suspected of narcotics distribution. In that case, the agent-affiant "stated in his affidavit that in his experience a person engaged in the distribution of cocaine frequently keeps at his residence a number of different items, which items [are] set forth in detail in the affidavit."

*Id.* at 399. The Court noted that "[t]he items listed in the search warrant [ ] are similar to those we see listed in most search warrant affidavits seeking evidence related to narcotic offenses." *Id.* In a footnote, the Court clarified that "[o]ngoing narcotics distribution operations typically generate a broad range of items which have evidentiary significance. To name a few—chemicals, money, firearms, records, ledgers, beepers, scales, [and] telephone numbers...." *Id.* at n. 7.

In the present case, Agent Stevens stated in his affidavit that "[b]ased on [his] training and experience, [he was] aware of ... the methods and procedures used by individuals to conduct their narcotics business ... [including] that drug traffickers often house and secret[e] records and/or documents regarding drug trafficking in their residences...." Affidavit, ¶ 10. Stevens then described the specific financial documents to be seized, as well as phone books and currency. *Id.*, ¶ 11.

The magistrate judge likewise set forth the items to be seized with sufficient particularity appropriate to the circumstances. The search warrant was not so broad as to constitute a "general warrant," and it provided adequate guidance to the agents executing the search warrant and left them little, if any, discretion. The search warrant in this case complied with the specificity requirement of the Fourth Amendment.

## IV.

■ The defendant also contends that the agents exceeded their authority while executing the search warrant by seizing two .22 caliber handguns from the premises. The defendant testified that the handguns were located in a locked gun cabinet. Agent Stevens stated that the gun cabinet was approximately six feet tall, and it had doors and compartments in it. The defendant unlocked the gun cabinet at the direction of the government agents, and Agent Stevens found two handguns and

approximately fourteen long guns in the gun cabinet.

Agent McGovern testified that the handguns were seized because they could be readily concealed and posed an immediate threat to the officers. Agent McGovern also testified that he knew that the defendant had previously been convicted of a felony, and the defendant's status as a convicted felon rendered his possession of firearms illegal.

The government concedes that the handguns were not listed as items for which the warrant authorized seizure. The government contends, however, that seizure of the handguns was proper because they constituted evidence of a crime and were discovered during the legitimate activity authorized by the warrant.

The "plain view" rule is a recognized exception to the warrant requirement of the Fourth Amendment. *See Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). In that case, the Supreme Court stated that officers at a place where they have a right to be can seize evidence, proceeds or instrumentalities of a crime as long as the discovery is inadvertent. *Id.* at 469, 91 S.Ct. 2022. The Supreme Court modified that rule in *Horton v. California,* 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990), by dispensing with the "inadvertency" prong of the test. The Court reasoned that the determination of whether a discovery is inadvertent tends to focus the inquiry on the officer's subjective state of mind. However, the validity of a search or seizure under the totality-of-circumstances test must focus on objective standards. Further, the stated purpose of the inadvertency requirement was to prevent police from converting specific warrants into general warrants and conducting general searches thereby. The Court in *Horton,* however, found that interest was protected by the first prong of the test. If the intrusion into a privacy interest is justified by a valid warrant or other recognized Fourth Amendment exception to the warrant requirement, then seizing an item in plain view whose incriminating character is obvious involves no further or greater invasion of privacy.

The *Horton* Court then articulated three requirements which must be satisfied to validate the seizure of an item not listed in a search warrant. First, the officer may not violate the Fourth Amendment "in arriving at the place from which the evidence could be plainly viewed." 496 U.S. at 136, 110 S.Ct. 2301. Second, the incriminating character of the evidence must be immediately apparent. *Id.* Third, the officers must have a lawful right of access to the object itself. *Id.* at 137, 110 S.Ct. 2301.

Thus, an officer with a warrant to search for a piano may not look through closets or rummage through bureau drawers. *See Platteville Area Apartment Ass'n, v. City of Platteville,* 179 F.3d 574, 579 (7th Cir. 1999)("If you are looking for an adult elephant, searching for it in a chest of drawers is not reasonable.") A warrant authorizing the search for smaller objects may justify a more intrusive sweep of premises.

In this case, the warrant authorized a search for documents. The gun cabinet located in the defendant's house was a potential repository of papers, books and records, and the officers could not see inside without opening the doors and drawers of that item of furniture. When the cabinet was opened, the long guns and handguns were in plain view and, since the defendant was a convicted felon, the incriminating nature of the weapons was obvious.

It is clear from the testimony that the agents seized the handguns primarily in the interest of their own safety, rather than because they were evidence of a crime. Agent McGovern testified that, in retrospect, he probably should have seized the long guns as well. Nonetheless, the subjective motive of the officers in seizing the weapons does not alter the analysis because it has little bearing on the defen-

dant's privacy interest which the Fourth Amendment is designed to protect. The record demonstrates objective, valid grounds for the officers' seizure of the handguns. Seizing the handguns did not violate the Fourth Amendment.

## V.

■ The defendant also claims that the stop of his vehicle two miles from his home when he was traveling away from his house violated the Fourth Amendment, and he suggests that "[i]f this stop was effected [*sic* ] without legal justification, anything flowing from that stop should be suppressed from evidence." Defendant's Brief at 7. He contends that evidence discovered during the pat-down search consisting of cash discovered on his person (which was returned to him that day) and his later statement to Agent McGovern back at his house must be suppressed. The defendant fails to support his position with citation to authority.

The government argues that agents were entitled to stop the defendant prior to executing the search warrant in order to ensure their safety, citing *United States v. Cochran,* 939 F.2d 337 (6th Cir.1991), *cert. denied* 502 U.S. 1093, 112 S.Ct. 1166, 117 L.Ed.2d 413 (1992). In that case, police officers with a warrant to search the defendant's house wanted to secure his cooperation in effectuating the entry because they knew the defendant carried a firearm and the house was protected by a guard dog. The officers waited for the defendant to leave in his vehicle, followed him for some distance and stopped him. In the course of the automobile stop, the officers searched the defendant and his car and found an unregistered firearm, which formed the basis of the defendant's prosecution in that case.

The Court of Appeals found that the stop of the defendant constituted a seizure implicating the Fourth Amendment. It analyzed the case in light of *Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), in which the Supreme Court held that officers executing a search warrant had the authority to seize the defendant and require him to reenter his house and remain there while the search warrant was executed. The *Cochran* Court had little trouble expanding that rationale to a stop which occurred a short distance from the defendant's residence. The Court reasoned that, as in *Summers,* the detention discouraged the resident from fleeing, officer safety was enhanced, the search could be completed in an orderly fashion, and the intrusion created by the detention was not greater than the intrusion resulting from the execution of the search warrant itself. *Cochran,* 939 F.2d at 338–39. In this case, the defendant argues that the officers had no reason to stop him because he was traveling away from his house rather than toward it. He was en route, he explained, to pick up a parrot which he intended to eventually bring back to his house. The officers, however, had no knowledge of the defendant's intended destination. Their paths crossed in the convenience store parking lot by happenstance. The defendant could have conceivably returned to his residence during the execution of the search warrant and thereby jeopardize the safety of the officers. The initial stop of the defendant, therefore, did not violate the Fourth Amendment.

■ Once the defendant was stopped, the officers could validly pat him down in order to search for weapons in order to ensure their safety. *See Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977). The discovery of a wad of cash, which caused a bulge in the defendant's jacket, occurred as a result of the pat down which was validly within the scope of permissible activities by the officer.

The statement made by the defendant to Agent McGovern at the residence resulted from an encounter that was initiated by the defendant himself. Agent McGovern testified that he gave the defendant his *Miranda* warnings before the conversation

took place, and the defendant did not dispute that fact at the evidentiary hearing. The statement by the defendant was no obtained in violation of either his Fourth or Fifth Amendment rights.

### VI.

The Fourth Amendment, and cases decided thereunder, express a strong preference for warrants issued by a neutral and detached judicial officer, as authorizations for searches and seizures. *See Johnson v. United States,* 333 U.S. 10, 13–14, 68 S.Ct. 367, 92 L.Ed. 436 (1948). Once a warrant has been issued by a magistrate who is neutral and detached, that magistrate's decision is afforded substantial deference by a court reviewing the assessment of probable cause after the fact. The defendant in this case has failed to establish that the magistrate's assessment of probable cause was improper in any way in this case. The search warrant was properly issued and executed, and the evidence discovered as a result was obtained in a manner consistent with the Constitution.

Accordingly, it is **ORDERED** that the defendant's motion to suppress any and all evidence obtained as a result of the search of his residence and the stop of his vehicle [dkt # 110] is **DENIED.**