*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 04a0403p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 03-1060

RICKY LEE NEWTON,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Flint.
No. 02-50002—Paul V. Gadola, District Judge.

Submitted: March 10, 2004

Decided and Filed: November 19, 2004

Before: SILER, MOORE, and SUTTON, Circuit Judges.

_____

## COUNSEL

**ON BRIEF:** James C. Mitchell, ASSISTANT UNITED STATES ATTORNEY, Flint, Michigan, for Appellee. Ricky Lee Newton, Bradford, Pennsylvania, pro se.

SILER, J., delivered the opinion of the court, in which SUTTON, J., joined. MOORE, J. (pp. 7-10), delivered a separate opinion concurring in part and dissenting in part.

_____

## OPINION

_____

SILER, Circuit Judge. Defendant Ricky Lee Newton appeals his conviction and sentence for conspiracy to possess with intent to distribute 100 to 1000 kilograms of marijuana in violation of 21 U.S.C. § 846. He raises questions concerning searches, competency at trial, and sentence computation. For reasons stated hereafter, the conviction and sentence are **AFFIRMED.**

## BACKGROUND

On January 10, 2002, state police stopped Eduardo Romero in Missouri driving a truck with a false compartment containing marijuana. Romero confessed that he had made nineteen previous marijuana deliveries from Texas to Michigan to a man named "Rick," whom Romero identified later as Newton. Romero gave details of his prior trips that were corroborated later by motel ledgers, phone records and his truck odometer. He also identified the location where he unloaded the marijuana at a rural residence of a

1

man named "Tim," later identified as Tim Wilson, who helped unload the marijuana. Romero agreed to cooperate in a controlled delivery of the marijuana.

Upon arrival in Michigan, the delivery on January 11, 2002 occurred exactly as Romero indicated it would. Romero arrived at Wilson's barn where Wilson began unloading the marijuana from Romero's truck and placing it into black plastic garbage bags. Newton arrived later and backed the truck he was driving into the barn where Wilson and Newton then began loading the marijuana into Newton's truck. Upon Romero's signal, officers descended on the scene, seizing 33 bundles of marijuana from Newton's truck and two stored in the rafters of the barn.

Upon arrest, Newton was found with two insurance receipts listing 6220 Fort Street, Birch Run, Bridgeport Township, Michigan as his address, which he had also given to his probation officer as his address. An additional receipt for building supplies dated January 4, 2002 was found in the glove box of the truck Newton was driving. It listed 8205 East Dodge Road, Forest Township, Michigan as his address. A receipt dated January 11, 2002 for building supplies made out to his fiancé, Lori Cool, was also found on Newton listing the same Dodge Road address. Newton informed officers that he resided at 9439 East Vienna Road, Forest Township, Michigan, which was determined by public records to be owned by Newton's father. Finally, the truck Newton was driving was registered to Cool, at an address of 2307 Vassar Road.

After a public records search, Sergeant Terence Green submitted an affidavit to a state judge for a search warrant for all four addresses. Included in the affidavit was information from a previously reliable informant stating a belief that Newton was engaged in drug dealing. However, the informant provided no facts in regard to drug dealing, but generally stated a series of beliefs. The judge granted the warrant on January 16, 2002. However, while executing the warrant, the Dodge Road address was identified as a house under construction. A marijuana package identical to those recovered from Romero's truck was found in an outbuilding at this address. Additionally, the Vassar Road address turned out to be a rental property with no connection to Newton's criminal activities.

Newton was indicted for substantive drug offenses and conspiracy with Wilson, and both known and unknown parties, to possess with intent to distribute 1000 kilograms or more of marijuana in violation of 21 U.S.C. § 846. Before trial, Newton moved to suppress evidence seized from the addresses as derived from an affidavit made with reckless disregard for the truth and lacking any information linking the addresses to criminal activity. He specifically pointed to the informant's non-factual conclusions and Sergeant Green's perceived lack of due diligence in not making more effort to verify the status of the house under construction and the rental unit. The government did not defend much of the information in the affidavit, but argued that when stripped of questionable material, the affidavit still contained probable cause to search the four addresses. The district court agreed as to all the addresses except for Vassar Road. In relation to that address, the district court found insufficient information had been presented to support a search. However, the court upheld the search as being based on the police's good faith reliance on the warrant.

Wilson and Newton were tried separately. Before Newton's trial, Wilson was acquitted of conspiracy, and the substantive charges against Newton were dismissed. Throughout Newton's trial, the government's main contention was the evidence supported a conspiracy between Newton and Wilson.

At the beginning of the second trial day, Newton's counsel complained to the court that Newton had not been able to sleep for three days due to being in a small holding cell with sixty other people, was not allowed to shower and was being denied basic hygiene. Counsel requested the court aid in securing at least "basic accommodations." The Deputy U.S. Marshal was directed to look into the matter. At the beginning of the third day of trial, Newton's counsel again complained to the court that Newton was not being allowed to sleep due to the conditions in the holding cell. Counsel also informed the court that "the difficulty with -- with Mr. Newton being sleep deprived, he's constantly babbling during the course of the trial. I'm trying

to tell him to keep quiet, unfortunately he's not making any sense. I think - - I think the jailer can do something to at least allow him to sleep." The court again directed the Deputy U.S. Marshal to address the matter. The issue was not brought up again during trial and appears to have been satisfactorily corrected.

During closing arguments, the defense prominently referred to an audio tape that had been made of Newton's conversations with Romero while unloading the truck. A government agent had testified that the tape did not pick up any identifiable conversation and was just static. The defense asked the jury to consider that the government did not play the tape for them, insinuating it was exculpatory and that was the reason why the tape was not played. In rebuttal, the prosecutor argued that if Newton wanted the tape played, he could have played it himself. The defense objected, calling the argument impermissible burden shifting since the defense has no obligation to produce evidence. The objection was overruled. The jury found Newton guilty of conspiring to possess with intent to distribute an amount of 100 kilograms or more of marijuana, but less than 1000 kilograms.

Before trial, the government served enhancement notice of two prior felony drug convictions under 21 U.S.C. § 851. Based upon these convictions, Newton was classified, over his objection, as a career offender under USSG § 4B1.1, with a guideline range of 360 months to life imprisonment. The court sentenced Newton to 360 months.

Newton appeals issues concerning: 1) the denial of his suppression motion; 2) the sufficiency of the evidence supporting his conviction; 3) whether a competency hearing was required due to sleep deprivation; 4) prosecutorial misconduct; and 5) whether his career offender status is a factual issue that must be submitted to a jury.

## ANALYSIS

### A. *Fourth Amendment seizure-insufficiency of the affidavit*

Newton claims the court erred in denying his motion to suppress. In reviewing a suppression motion, we review a court's factual findings for clear error, while conclusions of law are reviewed de novo. *United States v. Helton,* 314 F.3d 812, 820 (6th Cir. 2003). However, great deference is given a judge's decision to issue a warrant, which should only be set aside if it is found to have been "arbitrary." *Id.*

Newton contends, and the government stipulated, that much of the information contained in the affidavit was speculation, which the district court took into account during its review. If sufficient cause remains in an affidavit after being stripped of false or unwarranted information, the warrant may still be upheld. *United States v. Ursery*, 109 F.3d 1129, 1132-33 (6th Cir. 1997).

The judge had strong reason to suspect that Newton was a drug dealer with continuing and ongoing operations based on the detailed information supplied by Romero. "[I]n the case of drug dealers, evidence is likely to be found where the dealers live." *United States v. Jones*, 159 F.3d 969, 975 (6th Cir. 1998) (internal citations omitted). Additionally, with continuing criminal operations, any issue of staleness, or the lack of a direct known link between the criminal activity and residence, becomes minimal. *See United States v. Greene*, 250 F.3d 471, 481 (6th Cir. 2001).

Based on evidence obtained upon Newton's arrest, the police had cause to suspect that Newton maintained residences at three different locales, which was relayed to the judge in the supporting affidavit: 6220 Fort Street due to the insurance receipts and the information provided to his probation officer; 9439 East Vienna Road due to Newton's statement to police corroborated by public records that Newton's father owned the property; and 8205 East Dodge Road based on the receipts for building supplies listing Newton's

residence at that address, which also corroborated information from the informant that Newton was moving into a house he was building.[1]

Given that probable cause generally exists to search for the fruits and instrumentalities of criminal activity at the residence of a drug dealer with continual and ongoing operations, the judge's decisions as to these locales cannot be said to have been arbitrary. Detailed evidence of Newton's operations was provided to the judge. The police then supplied him with evidence that these addresses were locations where Newton was maintaining a residence. Without regard to any other information in the affidavit, probable cause existed to issue the warrant in relation to these three presumed residences of Newton.[2]

## B. *Sufficiency of the evidence-conspiracy*

Newton claims sufficient evidence of co-conspirators, particularly in light of Wilson's acquittal and Romero's cooperating witness status, was not produced at trial. Newton claims the rule of consistency, which requires the acquittal of a sole remaining conspirator if all co-conspirators are acquitted, and the fact that he cannot be convicted for conspiring with a government agent, should require his acquittal. For Newton to prevail, a sufficiency of the evidence review must establish that, when viewing the evidence in the light most favorable to the government, no rational trier of fact could have found beyond a reasonable doubt in favor of the government. *See United States v. Davis*, 177 F.3d 552, 558 (6th Cir. 1999).

**1. Wilson's acquittal.** First, the rule of consistency has no continuing validity. *See United States v. Crayton*, 357 F.3d 560, 566-67 (6th Cir. 2004). Second, the rule was not applied if co-conspirators were separately tried. *United States v. Sachs*, 801 F.2d 839, 845 (6th Cir. 1986). Therefore, Newton can be convicted of conspiring with Wilson despite Wilson's acquittal.

**2. Romero as a conspiring government agent.** Romero's testimony provided evidence of an agreement not only between himself and Newton, but among Wilson, Newton and unknown Texas suppliers. Sufficient evidence was adduced of a conspiracy between Newton and the unnamed/unknown co-conspirators that the indictment referred to, which can sustain a conspiracy. *See United States v. Anderson*, 76 F.3d 685, 688-89 (6th Cir. 1996). Hence, the rule from *United States v. Pennell*, 737 F.2d 521, 536 (6th Cir. 1984), that proof of an agreement between a government agent and the defendant cannot form the basis of a conspiracy, is inapplicable. Besides, Romero was not a government agent except on the final delivery.

## C. *Competency for trial*

Newton claims he was incompetent during trial due to being sleep deprived while being detained for trial. Newton contends that the trial judge should have ordered a competency hearing sua sponte on the basis of Newton's counsel informing the court on the third day of trial that "the difficulty with - - Mr. Newton being sleep deprived, he's constantly babbling during the course of the trial. I'm trying to tell him to keep quiet, unfortunately he's not making any sense."

A court's failure to order a competency hearing sua sponte is reviewed for "[w]hether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial." *Williams v. Bordenkircher*, 696 F.2d 464, 467 (6th Cir. 1983) (internal citations omitted).

---

[1] No evidence was seized from the Vassar Road or Vienna Road addresses. Since Newton might also lack standing to contest the Vassar Road search, *see Brown v. United States*, 411 U.S. 223, 229 (1973), any issues regarding the validity of these searches are irrelevant.

[2] Newton argues that the Dodge Road address that was searched was not actually owned or controlled by him, but that the officers searched a parcel of land near his own that had been subdivided from a larger tract. If correct in this argument, Newton might then lack standing to contest the search. *See Brown,* 411 U.S. at 229.

"It has long been accepted that a person whose mental condition is such that he lacks the capacity . . . to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." *Drope v. Missouri*, 420 U.S. 162, 171 (1975). The test is "whether a criminal defendant 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding – and whether he has a rational as well as factual understanding of the proceedings against him.'" *Id*. at 172 (quoting *Dusky v. United States*, 362 U.S. 402 (1960)(per curiam)). "It is a violation of due process to convict a person who lacks such competence at the time of trial." *Pate v. Smith*, 637 F.2d 1068, 1071 (6th Cir. 1981).

While "a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial," *Drope*, 420 U.S. at 181, Newton fails to point to evidence in the record that would have put the court on notice that a competency issue had arisen. At most, the trial court was made aware that Newton was lacking sleep, which was having some impact on his behavior at trial. Newton's counsel asked for, and evidently received, relief from the court. Counsel did not request a continuance to cure the sleep issue. This fact alone suggests that the sleep deprivation issue had not risen to the level of a due process violation since, at worst, Newton's competency issue was a temporary one that was curable by sleep, unlike the more familiar incompetency issues associated with mental illness. As counsel did not request a continuance, the trial court reasonably would not perceive any competency issue. Defense counsel was not indicating that Newton's ability to comprehend the proceedings or mount a defense was being impacted to such an extent that a "cure" was required.

Multiple factors "are all relevant in determining whether further inquiry is required, but . . . even one of these factors standing alone may, in some circumstances, be sufficient. There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed." *Drope*, 420 U.S. at 180. The record is devoid of any evidence of Newton's falling asleep or any other signs that his sleep deprivation had risen to the level of a constitutional due process violation. The trial court had multiple factors within its sensory perceptions to rely upon in evaluating the situation and Newton's competency. Without more within the record, this court declines to find that the trial court, situated as it was, should have experienced doubt with respect to Newton's competency to stand trial.

**D.** *Prosecutorial misconduct*

Newton claims the prosecutor improperly shifted the burden during closing argument by arguing to the jury that Newton could have played an audiotape that the government chose not to play for the jury.[3] Improper burden shifting is a violation of due process that is reviewed de novo. *United States v. Clark*, 982 F.2d 965, 968 (6th Cir. 1993).

The argument at issue was made to rebut defense insinuations that the government intentionally kept evidence away from the jury. *Clark* dealt with a similar situation where the defense implied at closing that the government failed to call a witness because the evidence would be favorable to the defendant. 982 F.2d at 968. The prosecutor argued in rebuttal that the defense could have called the witness if desired. *Id*. at 968-69. As in *Clark*, it is evident that Newton's prosecutor did not shift the burden, but made a legitimate reply to defense assertions that the government hid evidence from the jury. The defense opened the door to this rebuttal.

---

[3]Newton also claims a Jencks Act/*Brady* violation by asserting that the audiotape was not disclosed. This claim is without merit. Leaving aside that Newton does not point to any exculpatory value in a tape of his own conversations with Romero, the defense's cross-examination and closing argument demonstrate that the defense was intimately aware of the tape's existence.

**E.** *Evidentiary sufficiency-failure to amend the indictment*

Newton claims the evidence of the quantity of marijuana was insufficient to sentence him under the enhanced penalty provision of 21 U.S.C. § 841(b)(1)(B)(vii)(100 kilograms or more of marijuana). In his reply brief, Newton also claims the indictment was constructively amended during sentencing in violation of the Sixth Amendment, since he was indicted under 21 U.S.C. § 841(b)(1)(A) for possessing 1000 kilograms or more of marijuana, but the jury ultimately convicted him for possessing between 100 to 1000 kilograms, which sentence is under 21 U.S.C. § 841(b)(1)(B). Newton claims these differing amounts are separate statutory crimes so he should have been indicted for the lesser quantity for which he was actually convicted.

A sufficiency of the evidence review must establish that, when viewing the evidence in the light most favorable to the government, no rational trier of fact could have found beyond a reasonable doubt in favor of the government. *Davis*, 177 F.3d at 558. As Newton raises the constructive amendment issue for the first time, it is reviewed for plain error. *United States v. Taylor*, 102 F.3d 767, 769 (6th Cir. 1996).

**1. Sufficiency of the evidence.** Newton argues that only an "official" weighing could establish an amount beyond a reasonable doubt. However, the government provided logically extrapolated amounts based on the number of packages (35) seized from Romero and an "official" weighing of one of those packages, minus its packaging (23.6 pounds). Romero then testified as to the number of trips he made to Newton delivering "full loads," which he testified were identical to the amount seized when he was apprehended, along with some additional "light" loads.

The government contends, based on the amount seized and the number of loads testified to being delivered, that an amount of 2720 pounds (1236 kilograms) was proved at trial. However, the jury returned a verdict for an amount between 100 kilograms and 1000 kilograms, which is consistent with the approximately 175 pounds (80 kilograms) that was actually seized, with an allowance added for the extra delivered loads. These additional deliveries would, without doubt, amount to more than an extra 20 kilograms if Romero's testimony is to be believed. The jury concluded the evidence did not support a conviction for more than 1000 kilograms, but that it did for between 100 and 1000 kilograms. The evidence supports the jury's decision.

**2. Constructive amendment.** The claim that the indictment was constructively amended is without merit as the conviction for the smaller amount is a lesser-included offense of the indicted offense. *See United States v. Solorio*, 337 F.3d 580, 589-91 (6th Cir. 2003).

**F.** *Career offender status adjudged in violation of due process*

Newton argues that his career offender status under USSG § 4B1.1 is a factual issue that must be submitted to a jury under the Fifth and Sixth Amendments to the Constitution. Constitutional challenges to a sentence are reviewed de novo. *United States v. Perez-Olalde*, 328 F.3d 222, 224 (6th Cir. 2003).

The statutory maximum for Newton's crime is 40 years. 21 U.S.C. § 841(b)(1)(B). One prior felony drug conviction raises the prescribed sentence to not less than 10 years and not more than life imprisonment. *Id*. Therefore, the constitutional issues addressed in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), have no applicability, as prior convictions may be used as facts that increase prescribed sentences without being submitted to a jury. *See Harris v. United States,* 536 U.S. 545, 562-64 (2002). It was Newton's prior convictions which determined his career offender status and sentencing range, not any factual issues that must be proved beyond a reasonable doubt.

**AFFIRMED.**

---

## CONCURRING IN PART, DISSENTING IN PART

---

KAREN NELSON MOORE, Circuit Judge, concurring in part and dissenting in part. While I agree with the majority's resolution of Newton's claims as to the sufficiency of the evidence, prosecutorial misconduct, and sentencing, I write separately to express my discomfort with its resolution of Newton's challenge to the search warrants issued for his properties, and I dissent from the majority's resolution of Newton's competency claim.

## I. SUFFICIENCY OF THE AFFIDAVIT

In this case, the district court below and the majority opinion today both find probable cause to search properties associated with Newton on the strength of his involvement with the marijuana conspiracy and the blanket statement that evidence is likely to be found where drug dealers live. I believe this comes dangerously close to creating a special rule for drug-related search warrants, inappropriate under *Richards v. Wisconsin*, 520 U.S. 385, 392-95 (1997) (invalidating Wisconsin state court's per se rule allowing no-knock search warrants in every case of suspected drug trafficking), and to eliding the distinction between probable cause to believe an individual guilty of a crime and probable cause to search property owned by that individual, in contravention of *Zurcher v. Stanford Daily*, 436 U.S. 547, 556-559 & n.6 (1978) (emphasizing that the determinant of a proper search warrant is not that the owner of the property is suspected of a crime but that evidence is likely to be found on the premises), and *Chimel v. California*, 395 U.S. 752, 762-63 (1969) (disallowing warrantless searches of a suspect's house when the suspect is arrested in her home). Nonetheless, because I believe earlier circuit precedent controls the outcome today, I reluctantly agree with the majority that we must uphold the search warrant in this case. I write separately to discuss the cases that I believe control, and to emphasize the particular factual circumstances of this case.

This circuit first discussed extensively the propriety of basing probable cause on inferences to be drawn from the type of crime suspected in *United States v. Savoca*, 739 F.2d 220, 224-25 (6th Cir. 1984). In *Savoca*, arrest warrants had been issued for Savoca and an accomplice, and they had both been seen entering a motel room rented by the accomplice. A search warrant was authorized based only on that information. The government argued that probable cause existed to search the room because "'known bank robbers' tend to conceal fruits and instrumentalities of crime in places which are both accessible and private."[1] *Id.* at 225. The court rejected the government's argument.

> The fact that there is probable cause to arrest a person for a crime does not automatically give police probable cause to search his residence or other area in which he has been observed for evidence of that crime. If the rule were otherwise, "there would be no reason to distinguish search warrants from arrest warrants and cases like *Chimel v. California* would make little sense."

*Id.* at 224-25 (quoting *United States v. Lucarz*, 430 F.2d 1051, 1055 (9th Cir. 1970)) (internal citations omitted). The search warrant was found to be invalid, but upon a petition for rehearing after the Supreme Court's decision in *United States v. Leon*, 468 U.S. 897 (1984), the court found the officers' reliance on the warrant reasonable. *See United States v. Savoca*, 761 F.2d 292, 298 (6th Cir. 1985).

---

[1] That the same conclusion is drawn of both bank robbers and drug dealers suggests that there is nothing particular about any crime that tends to suggest where its instrumentalities are kept and that the rule that I am forced to follow today is a judicial fiction borne of expediency rather than reasoned constitutional analysis. *See Richards v. Wisconsin*, 520 U.S. 385 (1997) (rejecting a per se exception to the "knock and announce" rule for drug cases partially because "the reasons for creating an exception in one category [of Fourth Amendment cases] can, relatively easily, be applied to others," allowing the exception to swallow the rule).

Cases after *Savoca* were less concerned about the nexus between the evidence to be found and the location to be searched. *See United States v. Miggins*, 302 F.3d 384, 393-94 (6th Cir. 2002) (district court erred in finding no probable cause because evidence is likely to be found where dealers live); *United States v. Jones*, 159 F.3d 969, 975 (6th Cir. 1998) ("that 'in the case of drug dealers, evidence is likely to be found where the dealers live,' support[s] a finding of probable cause") (quoting *United States v. Lamon*, 930 F.2d 1183, 1188 (7th Cir. 1991) (internal citations omitted)); *United States v. Caicedo*, 85 F.3d 1184, 1192-93 (6th Cir. 1996) (finding probable cause based on affidavit that stated, based on affiant-officer's extensive experience, that "'many drug traffickers utilize their homes to conduct their illegal narcotics trafficking activities'"); *United States v. Davidson*, 936 F.2d 856, 860 (6th Cir. 1991) ("magistrate reasonably inferred that evidence would be found at Davidson's residence [as] '[i]n the case of drug dealers, evidence is likely to be found where the dealers live'") (quoting *United States v. Angulo-Lopez*, 791 F.2d 1394, 1399 (9th Cir. 1986)); *United States v. Martin*, 920 F.2d 393, 399 (6th Cir. 1990) (relying on statement of agent that "in his experience a person engaged in the distribution of cocaine frequently keeps at his residence a number of different items");[2] *see also United States v. Whitner*, 219 F.3d 289, 297-98 (3d Cir. 2000) (collecting cases finding probable cause based on drug-dealer inference from First, Second, Fourth, Sixth, Seventh, Eighth, Ninth, and D.C. Circuits, but declining to decide whether to adopt rule, resolving case on other grounds); *United States v. Nolan*, 199 F.3d 1180, 1183-84 & n.3 (10th Cir. 1999) (collecting cases and declining to decide issue). An exception to this general line is *United States v. Schultz*, 14 F.3d 1093, 1097-98 (6th Cir. 1994), which found that a search warrant for safe deposit boxes held by the defendant was not supported by probable cause, where the affidavit had contained the statement that, based on the training and experience of the affiant-officer, "'it is not uncommon for the records, etc. of such [drug] distribution to be maintained in bank safe deposit boxes.'" *Id.* at 1097 (alteration in original); *see also Nolan*, 199 F.3d at 1183 n.3 (noting conflict between *Schultz* and *Davidson*).

> While an officer's "training and experience" may be considered in determining probable cause, *see, e.g.,* [*Martin*, 920 F.2d at 399], it cannot substitute for the lack of evidentiary nexus in this case, prior to the search, between the safe deposit boxes and any criminal activity. Officer Ideker did not have anything more than a guess that contraband or evidence of a crime would be found in the boxes, and therefore the first warrant should not have been issued. To find otherwise would be to invite general warrants authorizing searches of *any* property owned, rented, or otherwise used by a criminal suspect — just the type of broad warrant the Fourth Amendment was designed to foreclose.

*Schultz*, 14 F.3d at 1097-98. *See also United States v. Watkins*, 179 F.3d 489, 507 (6th Cir. 1999) (Moore, J., dissenting) ("Simple knowledge that Louis, a co-defendant, owned both properties cannot cure this facially defective warrant — permitting search of any property owned by the suspect would be much more akin to the 'general warrants' of old than to the particularized requirements set down by the drafters of the Fourth Amendment.").

To the extent that *Schultz* is reconcilable with the other cases of this circuit in this line, it is because each of those cases included some additional "plus" that helped form a nexus between the place to be searched and the evidence sought. *See Miggins*, 302 F.3d at 393 (two roommates arrested after receiving delivery of cocaine package lived together at residence searched and were previously involved in drug trafficking); *Jones*, 159 F.3d at 1190 (confidential informant had been on premises, but outside searched house, in seventy-two hours preceding the affidavit and had there witnessed defendant in possession of cocaine for distribution); *Caicedo*, 85 F.3d at 1193 (defendant lied about his address to arresting officers); *Davidson*, 936 F.2d at 857-60 (officers witnessed coconspirators entering and exiting defendant's residence

---

[2] The majority additionally cites *United States v. Greene*, 250 F.3d 471, 481 (6th Cir. 2001), for the proposition that "with continuing criminal operations, any issue of staleness, or the lack of a direct known link between the criminal activity and residence, becomes minimal." Maj. Op. at 3. *Greene*, however, deals exclusively with the issue of staleness, as the affidavit supporting the warrant in that case contained observations by a criminal informant of contraband inside the house searched. Here, staleness is not an issue, only the lack of any direct link between the property and the crime.

in course of conspiracy); *Martin*, 920 F.2d at 399 ("one of the narcotics sales took place very near the residence and the confidential informant had been inside the residence and provided some information as to what was kept there"). In this case, two of the "plus" factors from these cases are present: as to the Fort Street residence, Newton may have attempted to conceal from officers that this was his true residence, Mot. to Suppress Evidence (R. 26) Ex. A at 5, ¶ 19; *see Caicedo*, 85 F.3d at 1193, and as to both the Fort Street residence and the Dodge Road residence,[3] some evidence existed that Newton and his girlfriend Lori Cool, who had been arrested with Newton for possession of marijuana in 1999, occupied both properties together. Mot. to Suppress Evidence (R. 26), Ex. A at 4-5, ¶¶ 13, 18, 21; *see Miggins*, 302 F.3d at 393.

Based on these factors, as well as the large amount of marijuana that Newton was found possessing, rather than merely suspected of possessing, and his apparent role as leader of the conspiracy, I reluctantly conclude that the prior law of this circuit dictates that probable cause existed to search the Fort Street and Dodge Road residences. I would emphasize, though, that this permissible inference, often based on an affiant-officer's years of experience, *see Caicedo*, 85 F.3d at 1193, should not become the sort of default rule explicitly rejected by the Supreme Court in *Richards*: "[I]n each case, it is the duty of a court confronted with the question to determine whether the facts and circumstances of the particular [situation] justified" the Fourth Amendment intrusion. 520 U.S. at 394. "The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *Zurcher*, 436 U.S. at 556. That an individual is suspected of drug trafficking should not give the police carte blanche to search her home, and that this and most of the other courts of appeals have come close to so holding is unfortunate. En banc or Supreme Court consideration of this issue would seem warranted.

## II. COMPETENCY

Title 18 U.S.C. § 4241(a) requires a district court, if reasonable cause exists to believe that a defendant is mentally incompetent to stand trial, to order sua sponte a hearing to determine the defendant's competency. When a defendant challenges a district court's failure to do so, our standard of review is "whether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial." *Pate v. Smith*, 637 F.2d 1068, 1072 (6th Cir. 1981) (quoting *De Kaplany v. Enomoto*, 540 F.2d 975, 983 (9th Cir. 1976), *cert. denied*, 429 U.S. 1075 (1977)). *See also Williams v. Bordenkircher*, 696 F.2d 464, 467 (6th Cir.), *cert. denied*, 461 U.S. 916 (1983).[4] A defendant is incompetent to stand trial when he does not have

---

[3] As the majority notes, only evidence seized from those two properties was used at trial.

[4] Although *Pate* and *Williams* are state habeas cases, as are later published cases reaffirming their standard of review, *see, e.g., Mackey v. Dutton*, 217 F.3d 399, 413-14 (6th Cir. 2000), *cert. denied*, 531 U.S. 1087 (2001), it stands to reason that our standard of review on direct appeal from a district court would certainly be no more deferential than our review of a state court in a habeas case. *See United States v. Colbert*, No. 00-1481, 2002 WL 31873484, *4 (6th Cir. Feb. 12, 2002) (citing *Williams* for standard of review in direct appeal), *cert. denied*, 537 U.S. 1211 (2003); *United States v. Cox*, No. 97-6120, 1999 WL 357828, *2 (6th Cir. May 26, 1999) (same), *cert. denied*, 529 U.S. 1010 (2000); *United States v. Knight*, No. 89-1478, 1990 WL 18055, *4 (6th Cir. Mar. 1, 1990) (same). A handful of prior unpublished cases have applied plain-error review. *See United States v. Czubaj*, No. 03-1412, 2004 WL 74647, *2 (6th Cir. Jan. 6, 2004); *United States v. Myles*, No. 02-5010, 2003 WL 21698861, *1 (6th Cir. July 17, 2003) (order); *see also United States v. McBride*, No. 01-3826, 2002 WL 926975, *3 (6th Cir. May 6, 2002) (indicating plain error applies but stating and applying correct standard). Plain-error review, however, based on a failure to object, makes little since where the complained-of error is the district court's failure to perform its duty under 18 U.S.C. § 4241(a). That is, no assignment of error depending on the district court's failure to order a hearing sua sponte will ever have been "objected" to by the complaining party below, as that "objection" would no doubt take the form of a motion for a hearing; there is no objected-to failure to raise competency sua sponte. This problem is acute with regard to competency, where waiver is especially problematic, as a defendant allegedly incompetent to stand trial is also allegedly incompetent to waive his right to a competency determination. *See West v. Bell*, 242 F.3d 338, 346 (6th Cir. 2001) (Moore, J., dissenting) ("'Once [his] competence was put in issue, [the defendant] could not waive his right to have his competence determined.'") (quoting *Harper v. Parker*, 177 F.3d 567, 571 (6th Cir.), *cert. denied*, 526 U.S. 1141 (1999) (first alteration in original)); *Horace v. Wainwright*, 781 F.2d 1558, 1563 (11th Cir.) ("[W]aiver cannot occur."), *cert. denied*, 479 U.S. 869 (1986).

"sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding — and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960) (internal quotation marks omitted).

I believe that Newton's defense counsel's statements on two of the three days of the trial that his client had gone without sleep for days, and his statement on the second day of trial that Newton was "constantly babbling during the course of the trial," and "not making any sense," go straight to Newton's ability to consult with and aid his attorney in his own defense, and therefore to the heart of the ultimate competency determination. While in light of the nature of his condition, and its easy remedy of a few good nights' sleep, a continuance until Newton was well-rested may have been the best course of action, I am not prepared to say that because Newton's counsel failed to seek a continuance, Newton's due process right to be competent at trial was not violated. Nor am I prepared to say that a temporary condition deserves less solicitude than a permanent one; merely because Newton's condition was easily cured does not mean his inability to consult rationally with his counsel and his "babbling" during trial fail to rise to the level of temporary incompetency. I believe these two comments by Newton's trial counsel, indicating that Newton had gone without sleep for 72 and later 96 hours straight, and that Newton's demeanor and ability to follow the trial proceedings and consult with counsel was affected by that sleep deprivation, were such that a reasonable judge should have experienced sufficient doubt to inquire sua sponte into Newton's competency to continue at trial. Finally, because of the temporary nature of Newton's condition, and the time elapsed since his trial, I believe a nunc pro tunc competency hearing would be inappropriate. *See Bowers v. Battles*, 568 F.2d 1, 5 (6th Cir. 1977) (adequacy of nunc pro tunc competency hearings dependent upon availability of contemporaneous evidence). Newton was not examined by any mental health professionals, and there is therefore a dearth of medical evidence as to his competency. I therefore would reverse Newton's conviction, and remand to the district court for further proceedings.

I respectfully dissent.