NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0737n.06

Case Nos. 13-1375 & 13-1387

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Sep 22, 2014
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SARA JOHNSON (13-1375 ) and KEVIN | ) | |
| ROMANDO JOHNSON (13-1387), | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| Defendants-Appellants. | ) | THE WESTERN DISTRICT OF |
| | ) | MICHIGAN |

BEFORE: COOK and GRIFFIN, Circuit Judges; RICE, District Judge.[*]

**COOK, Circuit Judge.**   A jury convicted Kevin and Sara Johnson of mail fraud, *see* 18 U.S.C. § 1341, and Kevin of making a false statement to a federal agent during an investigation, *see* 18 U.S.C. § 1001.  In addition to imposing prison sentences, the district court ordered each defendant to pay restitution.  The Johnsons appeal, pointing to prejudicial remarks by the prosecutor throughout trial; the district court's failure to cure that prejudice with an appropriate jury instruction; and the district court's determination of the amount of restitution without placing the issue before the jury.  Kevin also challenges the district court's denial of his

---

[*]The Honorable Walter H. Rice, United States District Judge for the Southern District of Ohio, sitting by designation.

motion for a continuance so that he could seek new counsel, and Sara contends that the district court improperly excluded certain evidence. Discerning no reversible error, we affirm.

I.

Kevin Johnson owned a landscaping/snow-removal company, Lansing Total Lawn Care ("LTLC"), in Michigan. The indictment charged him and his mother Sara (the company's Human Resources officer) with orchestrating a scheme to "cause[] the payment of [unemployment] benefits to LTLC . . . employees who had not in fact been laid off."

The morning prior to voir dire, Kevin moved the court to postpone trial to allow him to seek new counsel, asserting that his attorney's lack of preparedness caused a breakdown of trust. The court questioned the attorney and Kevin before denying the motion, assessing the situation as not sufficiently egregious to justify delaying trial.

At trial, the government presented voluminous evidence of Kevin and Sara's fraud. Several former LTLC employees testified that Kevin or Sara typically would (1) apply for unemployment benefits on the employees' behalf (R. 170, Trial Tr. (Husband) at 172−73; *see also* R. 119, Trial Tr. (Heddens) at 15−16; *id*. (Graham) at 91−92; *id*. (Therrian) at 112−13; *id*. (Alfaro) at 160−63); (2) report inflated past wages on the applications in order to increase the employees' benefit (*see, e.g*., R. 171, Trial Tr. (Bognar) at 112); (3) require the employees to continue working without a regular paycheck, sometimes threatening to "cut [the employees] off unemployment" for failing to come to work or reporting the scheme to authorities (R. 170, Trial Tr. (Husband) at 175; *see also* R. 119, Trial Tr. (Heddens) at 25−27; *id*. (Graham) at 94); and (4) instruct the employees to report biweekly to the Michigan Unemployment Insurance Agency (UIA) to describe themselves as "unemployed" and thus eligible for continuing benefits (*see, e.g*., R. 170, Trial Tr. (Kellogg) at 62; R. 119, Trial Tr. (Alfaro) at 162−63). According to a

federal investigator who prepared a chart analyzing LTLC's false representations, UIA overpaid $315,471 to LTLC employees.

Kevin and Sara attempted to downplay their role in the scheme. Sara painted herself as absent from the office; and after several witnesses mentioned that her husband suffered from an illness during the relevant time period, she requested that the court admit his hospitalization records so that "the jury can take into consideration . . . her focus and attention not necessarily being directed to the[] business." (R. 120, Trial Tr. at 11.) The court excluded the records as irrelevant.

Moreover, the defendants pointed the finger at a non-defendant co-manager, Amanda Evans, because many witnesses tied her to the fraud. During closing arguments, Kevin's attorney asked the jury rhetorically, "Why did we not hear from [Evans]?" (R. 121, Trial Tr. at 47.) The prosecutor rebutted by questioning "why *they* didn't call Amanda Evans." (*Id*. at 61−62 (emphasis added).) "Maybe," the prosecutor continued, "because Amanda Evans knew where all the bodies were buried and they wouldn't have liked the answers she was going to give you." (*Id*. at 62.)

The jury found the Johnsons guilty as charged. Sara then moved for a new trial, arguing that many of the prosecutor's comments constituted misconduct. The court denied her motion, finding that no comment reflected both impropriety and flagrancy.

The district court sentenced Kevin to 48 months' imprisonment, Sara to 36 months, and ordered the defendants to pay restitution in the amount shown on the federal investigator's chart, $315,470, without placing the issue before the jury.

This appeal followed.

II.

*A. Kevin's Motion to Continue His Trial*

Kevin first argues that the district court abused its discretion in denying his motion to postpone the start of trial to allow him to seek new counsel. The trial judge enjoys "broad discretion" in deciding not to delay trial when a defendant requests a change of an attorney. *See Morris v. Slappy*, 461 U.S. 1, 11−12 (1983) ("[O]nly an unreasoning and 'arbitrary insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel."). In *United States v. Mack*, 258 F.3d 548 (6th Cir. 2001), we identified the relevant considerations that guide our review of the issue:

> [W]e generally must consider (1) the timeliness of the motion, (2) the adequacy of the court's inquiry into the matter, (3) the extent of the conflict between the attorney and client and whether it was so great that it resulted in a total lack of communication preventing an adequate defense, and (4) the balancing of these factors with the public's interest in the prompt and efficient administration of justice.

*Id*. at 556. Assessing these factors, each weighs in favor of upholding the court's exercise of its discretion to deny the motion.

First, Kevin waited until the start of voir dire to request a change of lawyers, and we find motions untimely under such circumstances. *See United States v. Vasquez*, 560 F.3d 461, 467 (6th Cir. 2009) (request made a week prior to the original trial date and again two weeks before the rescheduled trial date); *United States v. Chambers*, 441 F.3d 438, 447 (6th Cir. 2006) (request made one and a half months before trial). Kevin counters that the day of voir dire was the first reasonable opportunity after the government disclosed, just 72 hours earlier, "witnesses and the Jencks Act material." But he fails to explain what information in those materials ignited a sudden disagreement with his attorney.

Second, the district court thoroughly questioned both Kevin and his attorney about the alleged conflict between them. (*See* R. 169, Trial Tr. at 4−21.) Kevin thus "had ample opportunity to discuss in detail his complaints regarding [his attorney] and to respond to [the attorney]'s representations regarding their relationship." *See Vasquez*, 560 F.3d at 467.

Third, nothing in the record reflects that the conflict could "result in a total lack of communication between attorney and client, preventing an adequate defense." *See United States v. Mooneyham*, 473 F.3d 280, 292 (6th Cir. 2007). When asked to articulate his conflict with counsel, Kevin offered only vague complaints that, for example, "nothing has been investigated" and the attorney "didn't do what he's supposed to do." (R. 169, Trial Tr. at 9−10.) *See United States v. Jennings*, 83 F.3d 145, 149 (6th Cir. 1996) (noting that "some dissatisfaction with counsel" is not enough to sustain motion). And though counsel expressed a general concern that the case was "not set . . . up properly" and "under-funded," he assured the court that he was "prepared to go forward."

Fourth, "the public's interest in the prompt and efficient administration of justice" supports the court's decision. "When the granting of the defendant's request would almost certainly necessitate a last-minute continuance, the trial judge's actions are entitled to extraordinary deference." *Vasquez*, 560 F.3d at 461 (internal quotation marks and brackets omitted). Prior to the time Kevin moved to replace counsel, an entire jury venire traveled to Grand Rapids for selection, and the government incurred considerable costs to transport witnesses to the area. Under these circumstances, we defer to the district court's decision to deny a continuance.

### B. Admissibility of Sara's Husband's Medical Records

Next, Sara argues that the district court abused its discretion in excluding her husband's medical records because they supported her defense of being distracted from work during the relevant time frame. "Evidence is relevant if . . . (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. "If a district court incorrectly excludes evidence, we will not reverse unless the error affected the defendant's 'substantial rights,' Fed. R. Crim. P. 52(a), asking whether it is 'more probable than not that the error materially affected the verdict,'" *United States v. Dimora*, 750 F.3d 619, 628 (6th Cir. 2014) (quoting *United States v. Davis*, 577 F.3d 660, 670 (6th Cir. 2009)).

Even if the district court erred in excluding the records that showed the "number of [her husband's] hospitalizations," the jury heard ample testimony that Sara attended work "pretty much every day" and that she "[d]id [not] seem confused or distracted" at the office. (R. 119, Trial Tr. (Heddens) at 12; R. 170, Trial Tr. (Husband) at 168−69.) Witnesses testified that she "ran a lot of the business" (R. 170, Trial Tr. (Boak) at 7), often threatening workers to participate in the scheme (*see, e.g.*, R. 170, Trial Tr. (Husband) at 175). Any error therefore did not prejudice Sara.

### C. Prosecutorial Misconduct

The Johnsons together argue that various comments made by the prosecution violated due process, warranting the court's declaring a mistrial. Sara also contends that the court abused its discretion in denying her new-trial motion premised on prejudicial comments. "To prevail, [the defendants] must show that the prosecutor's remarks were not just improper but that they were 'flagrant.'" *Bedford v. Collins*, 567 F.3d 225, 233 (6th Cir. 2009) (quoting *United States v.*

*Carson*, 560 F.3d 566, 574 (6th Cir. 2009)). Flagrancy turns on "(1) whether the comment was likely to mislead the jury or otherwise prejudice the defendant; (2) whether it was an isolated occurrence or part of an extensive pattern; (3) whether it was made deliberately or by accident and (4) whether the prosecution's other evidence was strong." *Bedford*, 567 F.3d at 233. Though the Johnsons provide a litany of allegedly improper and flagrant prosecutorial comments, we distill them into four categories, none of which requires a new trial.

*1. Comments conflating the defendants.* Kevin and Sara first argue that various prosecutor comments "lump[ed] the two defendants together to paint the picture that the evidence offered was against both of them." But much of the evidence *was* against both of them, and neither defendant points to anything in the record that actually was improper. For example, the prosecutor's closing comment that "[t]he two of them were running this business" (R. 121, Trial Tr. at 66) comports with evidence that Kevin owned the company and Sara ran much of the business. Kevin cites a remark that incorrectly tied Sara to Kevin's lie to the investigator, but the prosecutor promptly corrected his mistake by saying, "I'll leave [Sara] out of that one." (R. 121, Trial Tr. at 64.)

*2. Comment regarding Amanda Evans.* The Johnsons next argue that the prosecutor's rebuttal comment about Evans—noting the possibility that the Johnsons did not call Evans because she would have offered unfavorable testimony—shifted the burden of proof to the defendants. But the prosecutor never suggested that the burden of proof belonged to the Johnsons and, instead, merely rebutted a similar comment made by Kevin's attorney. When a defendant "implie[s] at closing that the government failed to call a witness because the evidence would be favorable to the defendant," the prosecutor may properly comment that the "defense [too] could have called the witness if desired." *United States v. Newton*, 389 F.3d 631, 638 (6th

Cir. 2004) (vacated on other grounds); *see also United States v. Henry*, 545 F.3d 367, 381 (6th Cir. 2008) ("[I]f the prosecutor's remarks were 'invited,' and did no more than respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction."). Kevin's counsel insinuated in his closing argument that the government failed to call Evans because her testimony would undermine its case.[1] (R. 121, Trial Tr. at 48.) So the prosecutor's rebutting suggestion "was . . . fair comment designed to meet the defense counsel's argument." *United States v. Clark*, 982 F.2d 965, 969 (6th Cir. 1993).[2]

Kevin and Sara also insist that the prosecutor "bolstered" Evans's hypothetical testimony and implied that the prosecutor bore specialized knowledge that Evans would testify in favor of the government. But the prosecutor raised only the common-sense notion that "[m]aybe" Evans would testify unfavorably. (R. 121, Trial Tr. at 62.)

Even if we were to consider the prosecutor's comment improper, it prejudiced neither of the defendants given the overwhelming evidence against them. Several witnesses offered personal knowledge of Kevin and Sara participating in the scheme—that they placed employees on unemployment, threatened them into coming to work anyway, and taught employees how to lie to the UIA. No evidence suggested that Evans played an overriding role.

---

[1] Sara argues that the government's comment prejudiced her more than Kevin because it was *Kevin's attorney* who insinuated that Evans would testify against the government. But because Kevin's attorney did not limit his comment to Kevin specifically, the government's rebuttal affected both defendants equally. Similarly, Kevin contends that the comment prejudiced him more because the prosecutor commented that Evans was "under . . . defense subpoena" even though only *Sara* issued the subpoena. This comment lacked relevance, however, because the key point of the government's contention was that neither defendant called Evans—not that defendants subpoenaed Evans.

[2] Kevin makes a similar argument regarding a prosecutor's comment that Kevin could have played the end of a tape recording that formed the basis for his false-statement conviction. (R. 121, Trial Tr. at 63−64.) Kevin's attorney invited this comment, too, by saying to the jury, "Why did we not hear the rest of the tape?" and thus insinuated that the end of the tape would hurt the government's case. (*Id*. at 47.)

3. *Comment regarding defense counsel's tactics*. In his closing rebuttal argument, the prosecutor commented on defense counsels' aggressive cross-examination technique, calling it "the same thing" as the "threat[s]" the employees faced from Kevin and Sara at LTLC.[3] Citing no authority, the defendants interpret this comment as "suggesting it was trial counsel themselves who had been engaged with the defendants in some kind of protective scheme." The prosecutor merely drew an analogy to Kevin and Sara's conduct, however, and the comment falls within its "'wide latitude' [permitted] during closing argument to respond to the defense's strategies, evidence and arguments." *Bedford*, 567 F.3d at 233 (finding no impropriety in comment that defense attorney tried to "confuse" the jury by "fill[ing] the courtroom with . . . smoke" (citations omitted)).

4. *Comment that the defendants abused a "sacred trust."* The final challenged comment involves a prosecutor's remark that "[u]nemployment is a sacred trust" and that the "two defendants abused that trust for their own greed." (R. 121, Trial Tr. at 71.) Case law makes clear that "[n]othing prevents the government from appealing to the jurors' sense of justice." *Bedford*, 567 F.3d at 234. Though the defendants analogize to a case where the prosecutor suggested that a conviction would maintain national security during World War II, *see Viereck v. United States*, 318 U.S. 236, 247−48 (1943), this case reflects a more innocuous appeal to "send a message," *see United States v. Wiedyk*, 71 F.3d 602, 610−11 (6th Cir. 1995) (finding that "send a message" remarks do not rise to the level of denying a fair trial); *see also Bedford*, 567 F.3d at

---

[3] Sara also quotes the prosecutor's comments that Kevin's attorney "basically . . . called [one witness] stupid" and that Sara's attorney "called [another witness] a crack-head over and over again." She offers no separate argument, however, that these fleeting comments deprived her of a fair trial. Moreover, though she complains that the prosecutor said she "seems to have been trying to evade paying her taxes, she develops no argument that this comment mischaracterized the evidence or prejudiced her in any way.

234 (finding no impropriety in prosecutor's comment that each juror could say, "I did [the victim] justice").

### D. Jury Instruction

The Johnsons' penultimate contention concerns the court's failure to issue a curative instruction regarding the Evans aspect of the prosecutor's comments. During jury deliberations, the judge gathered the parties to propose a curative instruction because he "became a bit concerned" about the Evans comment. (R. 122, Trial Tr. at 4.) The judge's proposal would have told the jury that (1) "the government bears the burden of proving guilt beyond a reasonable doubt," (2) the jury "must make [its] decisions based only on the evidence . . . heard in this courtroom," and (3) the jury "may not engage in speculation as to what Ms. Evans may have said had she been called as a witness." (R. 97-2, Proposed Jury Instruction.) Kevin's attorney wanted the instruction, but Sara's attorney disagreed because "the instructions that the Court gave previously were quite clear as is." The judge agreed with Sara's attorney and offered no curing instruction.

Refusal to deliver a proposed jury instruction warrants reversal only if it is "not substantially covered by the charge actually delivered to the jury." *United States v. Carson*, 560 F.3d 566, 578 (6th Cir. 2009). Here, the judge told that jury that (1) "It is up to the government to prove that [the defendants] are guilty, and this burden stays on the government from start to finish," (2) "the lawyers' statements and arguments are not evidence," and (3) "Do not speculate about what a witness might have said . . . ." (R. 121, Trial Tr. at 7−8.) The proposal covered no new ground, and the district court thus committed no error in not delivering it.

*E. Restitution*

Last, the Johnsons contend that the district court violated the Sixth Amendment by determining the amount of restitution on its own without presenting the issue to the jury. *See Apprendi v. New Jersey*, 530 U.S. 466 (2000). Kevin and Sara acknowledge that their argument directly contradicts our holding in *United States v. Sosebee*, 419 F.3d 451, 461–62 (6th Cir. 2005), that restitution falls outside the bounds of the Sixth Amendment.

The Johnsons instead argue that *Southern Union Co. v. United States*, 132 S. Ct. 2344 (2012)—which held that a jury must determine the amount of a fine to the extent that the amount exceeds a statutory maximum—calls *Sosebee* into question. We recently rejected an identical contention in *United States v. Jarjis*, 551 F. App'x 261, 261−62 (6th Cir. 2014) (per curiam) (citing cases from three other circuits), "because restitution has no statutory maximum and because the Mandatory Victim Restitution Act mandates that judges determine the amount."

Kevin and Sara similarly cite *Alleyne v. United States*, 133 S. Ct. 2151 (2013). But that case, which held that facts *increasing the statutory minimum* sentence of imprisonment must be presented to a jury, lacks relevance for reasons similar to those noted in *Jarjis*. The district court thus committed no error in calculating restitution. [4]

III.

We AFFIRM.

---

[4] Sara also attempts to extend *Apprendi* beyond statutory penalties to *guideline calculations*, arguing that the jury should have determined the loss amount attributable to her and whether a sentencing enhancement for managing a criminal scheme applied. But she again cites no authority for this novel proposition, and case law clearly dictates that *Apprendi* applies only to statutory penalties. *See, e.g. United States v. Johnson*, 732 F.3d 577, 584 (6th Cir. 2013) ("*Alleyne* did not extend *Apprendi* to facts that do not increase the prescribed statutory penalties.").

**RICE, District Judge, concurring.**  I concur fully with the conclusions reached by the majority.  I write separately only to discuss the comments made by the prosecutor.  Like the majority, I ultimately conclude that his comments did not violate either defendant's right to a fair trial.  I do, however, believe that several of them were improper, even if they were not flagrant enough to constitute prosecutorial misconduct.  My discussion is confined to the following four categories of comments:  1) the prosecutor's comments regarding the absence of testimony from Amanda Evans and his invocation of the invited reply doctrine; 2) the prosecutor's comments about the tactics of defense counsel; 3) the prosecutor's reference to unemployment insurance as "a sacred trust"; and 4) the prosecutor's insinuation that Sara had evaded paying her taxes.

The Sixth Circuit applies a two-step test to claims of prosecutorial misconduct.  *United States v. Carson*, 560 F.3d 566, 574 (6th Cir. 2009) (citing *United States v. Gardiner*, 463 F.3d 445, 459 (6th Cir.2006)).   First, the court determines if the prosecutor's statements were "improper."  *Id.*  Second, if the statements were improper, a determination must be made as to "whether the remarks were flagrant and thus warrant reversal."  *Id.*

*1.  Comments regarding Amanda Evans and the invocation of the "invited response" doctrine.*  "Under the 'invited response' rule, a 'reviewing court must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo.'"  *United States v. Henry*, 545 F.3d 367 (6th Cir. 2008) (quoting *United States v. Young*, 470 U.S. 1, 11-12 (1985)).  If the defendant "invites" the prosecutor's remarks, which only "respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction."  *Id.*  Thus, a prosecutor's "legitimate reply to defense assertions that the government hid evidence from the jury" would not constitute improper burden shifting.  *United States v. Newton*, 389 F.3d 631, 638 (6th Cir. 2004), *rev'd on other grounds by Newton v. United States*,

546 U.S. 803 (2005) (rejecting defendant's argument that the "prosecutor improperly shifted the burden during closing argument by arguing to the jury that [defendant] could have played an audiotape that the government chose not to play for the jury" where the prosecutor's argument "was made to rebut defense insinuations that the government intentionally kept evidence away from the jury"); *see also United States v. Clark*, 982 F.2d 965 (6th Cir. 1993) (holding that no improper burden shifting occurred when prosecutor remarked upon defendant's failure to call a witness in response to defense counsel's assertion that the witness would not have corroborated testimony of another government witness).

J. Nicholas Bostic, Kevin's attorney, made repeated references to Amanda Evans during his closing arguments. The first thing that Bostic said after greeting the jury was "reasonable doubt in this case has a name and that name is Amanda Evans." On several occasions, Bostic asked "Why did we not hear from Amanda?" Bostic also stated:

> The reasonable doubt in this case is Amanda Evans. They want you to do the heavy lifting for them. They want you to make logical leaps that are unsupported by the evidence or any inferences from it. They have simply failed to prove their case. They have left open the entire question of who is Amanda Evans, what did she do, *where is she and why is she not here*. (emphasis added)

"In every criminal case, the mosaic of evidence that comprises the record before a jury includes both the evidence *and* the lack of evidence on material matters. Indeed, it is the absence of evidence upon such matters that may provide the reasonable doubt that moves a jury to acquit." *United States v. Poindexter*, 942 F.2d 354, 360 (6th Cir. 1991) (reversing trial court's decision to prevent defense counsel from commenting on prosecution's failure to introduce fingerprint test results that did not reveal defendant's prints on contraband). In this instance, Kevin's counsel cannot be faulted for attempting to leverage the absence of testimony from a person that was repeatedly referred to by Defendants' testifying employees into a jury finding of

reasonable doubt. However, his remarks also invited the jury to speculate on the Government's motive for not calling Amanda Evans as a witness, and to infer that her testimony would have been unfavorable to the Government. This "opening salvo" justified some response by the Government. *United States v. Young*, 470 U.S. 1, 12 (1985).

Sara's counsel, Richard Stroba, also mentioned Amanda Evans, but he did not launch a comparable "opening salvo." Rather, his comments were only directed towards testimony that the jury had heard or evidence in the record:

> . . . the only evidence in this record is that [exhibits] H and I weren't signed by Sara Johnson; they were signed by somebody else. We don't know who. I would suggest the reasonable inference, based upon the testimony you heard, is Amanda Evans or perhaps Kevin Johnson, but not Sara.

> Ms. Heddens testified that from time to time she would put things in these binders. I suspect, too, that Amanda Evans put things in the binders.

> Every other employee who testified essentially similarly, and I think that you can find this to be true, that Amanda Evans was the one who filled out the UI forms and filed them, took their information, inputted it into the computer, sent it off and brought them back their PIN number and told them what to do, not Sara Johnson.

In contrast to Bostic's remarks, Stroba's remarks did not invite a comparable response from the Government. Rather, his references to Evans all attempted to cast reasonable doubt on his client's participation in the scheme. Stroba never mentioned Evan's absence as a witness, much less associated it with the prosecution's strategy. Thus, although the Government may have been warranted in responding to Bostic's statements, it was not proper for the prosecutor to state that he was responding to what *both* Defendants' attorneys had said when he stated the following in his rebuttal:

> First and foremost, you heard both defense counsel repeatedly say, "Where is Amanda Evans? Why haven't you heard from her?" And this is what we call the Invited Reply Doctrine. This is where I get to tell you she was right out there under defense subpoena and they didn't call her. So ask yourselves why they

didn't call Amanda Evans. Maybe the same reason Kevin and Sara didn't fire Amanda Evans even two years after she supposedly did everything and got them in all this trouble, because Amanda Evans knew where all the bodies were buried and they wouldn't have liked the answers she was going to give you.

It was improper for the prosecutor to invoke the invited response doctrine with regards to comments made by Sara's counsel. It was only Bostic, Kevin's attorney, who made comments suggesting that the Government made a strategic decision to not call Amanda Evans as a witness. Thus, it was also improper for the prosecutor to assert that the "defense" had subpoenaed Evans, when only Sara had done so.

*2. Comments regarding the conduct of Defendants' attorneys.*

On rebuttal, the prosecutor also stated:

Now, both defense attorneys have been telling you that you shouldn't believe any of these workers, that they're all suspect. You know what? You're hearing the same thing in the courtroom that was happening to these workers the whole time they were there: You don't play along, you get cut off, you get no paycheck, you get no job. And what did you hear these people say? "Nobody will believe you because we have good lawyers." And you saw that threat playing out right in front of you. Mr. Bostic, you saw him cross-examining Angela Heddens who got up here and seemed pretty upset to basically be called stupid. Mr. Bostic stood up here and said, "Can you read the English language?" That's the kind of treatment she could expect and why she probably kept her mouth shut.

You heard Mr. Stroba saying to Mike Husband, who admitted to you that he used to use drugs, that he had a criminal history, that's why he couldn't find another job, and Mr. Stroba called him a crack-head over and over again. "Were you using crack that day, the day before? Are you a crack-head now?" That's the treatment he could expect.

It is true that "[t]he prosecution necessarily has 'wide latitude' during closing argument to respond to the defense's strategies, evidence and arguments." *Bedford v. Collins*, 567 F.3d 225, 234 (6th Cir. 2009) (citing *United States v. Henry*, 545 F.3d 367, 377 (6th Cir. 2008)). But such latitude does not allow the prosecutor to equate the criminal conduct of the Defendants with their attorneys' cross-examination of the witnesses. In this instance, the association carried

particular force because part of the Government's theory of the case was that the witness-employees were vulnerable people that Kevin and Sara had preyed upon in order to carry out their fraud scheme. The prosecutor even referred to the former testifying employees as "victims" of Defendants' fraud ("You've heard from all those people and the ways in which they were victimized"). It was improper for the prosecutor to suggest that the witnesses' treatment by defense counsel during cross-examination fulfilled a threat that Sara made to them during the execution of the fraud. The prosecutor's rhetoric risked undermining the jurors' perception of the integrity of the cross-examination process by blurring the distinction between the conduct that Kevin and Sara were accused of with the defense tactics of their attorneys.

*3. The Government's appeal to civic duty.* Defendants argue that the following comments of the prosecutor amount to an improper appeal to civic duty:

> You've heard from all those people and the ways in which they were victimized, but let me suggest to you there's another victim, too. The Unemployment Insurance Agency. All that money is the people's money, it's the taxpayers' money, and I'm not suggesting to you that you should feel bad for the Unemployment Insurance Agency because it's some big government program. Unemployment is more than that. Unemployment is all of us caring for each other, reaching a hand out to a neighbor who's down on their luck and helping them up, helping out a worker who needs to get back up on their feet. Some of us in this room have been there before. Many of us will be there again or people we love will be there again. Unemployment is a sacred trust.

"Nothing prevents the government from appealing to the jurors' sense of justice" during closing arguments. *Bedford*, 567 F.3d at 234 (citing *Coe v. Bell*, 161 F.3d 320, 351 (6th Cir. 1998)). Certain appeals are patently improper, however, such as encouraging jurors to identify with crime victims. *Johnson v. Bell*, 525 F.3d 466 (6th Cir. 2008). "The prosecutor must avoid 'undignified and intemperate' arguments and arguments that may contain 'improper insinuations and assertions calculated to mislead the jury' by inciting passion and prejudice." *United States v.*

*Lawrence*, 735 F.3d 385, 432 (6th Cir. 2013) (quoting *United States v. Solivan*, 937 F.2d 1146, 1150 (6th Cir.1991)).

Here, the prosecutor's remarks walk a fine line between appealing to the jurors' sense of justice and identifying with the victim. By describing the Unemployment Insurance Agency, the victim of the Johnson's fraud, as a "sacred trust" comprised of "all of us caring for each other," and that has helped "[s]ome of us in this room," the prosecutor's remarks appear designed to align the jury, as members of society, with the victim. Nevertheless, the remarks were not calculated to mislead, nor do they seem likely to have resulted in juror passion that might have overcome the ability to make a reasoned determination of Kevin and Sara's guilt. While the prosecutor's remarks certainly gave the jury reason to connect the effects of their crimes to society at large, the remarks were not an improper appeal to civic duty.

*4. Comment about Sara not paying taxes.* Sara argues that the following statement of the prosecutor was improper:

> You know why she was getting paid under the table and not on the official payroll. When you're on the official payroll, the IRS gets a W-2. So the fact she seems to have been trying to evade paying her taxes doesn't make her innocent, does it?

These remarks were improper. Sara was on trial for mail fraud, not the unrelated offense of tax evasion. Furthermore, the prosecutor's statement suggested that her alleged failure to pay taxes was somehow probative of her guilt for the offense of mail fraud, and its strength relied upon a suggestion of Sara's bad character. "A fundamental rule of evidence is that a defendant's 'bad character' cannot be used to argue that the defendant committed the crime for which he is being tried, or had the propensity to commit that crime." *Washington v. Hofbauer*, 228 F.3d 689, 699 (6th Cir. 2000) (citing Fed. R. Evid. 404(a)); *see also Hodge v. Hurley,* 426 F.3d 368 (6th Cir. 2005) (finding prosecutor's suggestion improper that child rape defendant "regularly drank

alcohol illegally by passing himself off as being over twenty-one years of age—a claim that in no way relates to the crime charged" because it emphasized the defendant's "bad character"). The prosecutor's remarks suggested that Sara was a tax evader and was therefore not "innocent." The suggestion was wholly improper.

5. *No comment was sufficiently flagrant to warrant a new trial*. Even if several of the prosecutor's remarks were improper, however, they were not sufficiently flagrant to grant either defendant a new trial when considered within the context of the trial as a whole.

The following four factors are used to evaluate flagrancy: "(1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong." *United States v. Carson*, 560 F.3d 566 (6th Cir. 2009) (quoting *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001). Considering the first factor, the prosecutor's remarks may have misled the jury as to which of the defense attorneys' statements warranted the invited reply. As discussed, only Kevin's attorney made comments that invited a reply. However, none of the other improper comments could have misled the jury in their consideration of the actual evidence the jurors considered.

The comments were "isolated," which weighs against a finding of flagrancy under the second factor, because the prosecutor made them only in the rebuttal to Bostic's closing argument. The remarks were clearly "deliberate," and not "accidentally made," as the prosecutor was directly addressing Bostic's remarks. This weighs in favor of flagrancy under the third factor.

The fourth factor, which asks "whether the evidence against the defendant was strong," decidedly does not weigh in the Defendants' favor. *Id.* The former employees testified that Sara had given them instructions on how to fill out unemployment insurance paperwork and operate its phone system, threatened the employees that they would go to jail if they reported the scheme, and even demanded kickbacks from the checks. The evidence also showed that Sara contacted the unemployment agency and the payroll companies and kept two sets of binders in her office that evidenced the fraud. Kevin went to the unemployment office in person to pose as an employee and applied for benefits himself, in addition to taking an unemployment check from an incarcerated employee's mailbox. The Government had strong, compelling evidence of Sara and Kevin's guilt. In short, although the prosecutor made several improper comments during the trial, they were not flagrant enough to warrant a new trial.

As the foregoing discussion indicates, my only difference with the majority concerns the propriety of several of the prosecutor's comments. None of them amounted to prosecutorial misconduct, however. In that conclusion and in all others reached in the majority's opinion, I wholly concur.